768 So.2d 634 (2000)
Clodie BRUMFIELD
v.
COASTAL CARGO COMPANY, INC. and James Farrow.
No. 99-CA-2756.
Court of Appeal of Louisiana, Fourth Circuit.
June 28, 2000.
Writ Denied October 27, 2000.
*636 Paul H. Dué, Kirk A. Guidry, Dué, Caballero, Price, & Guidry, Baton Rouge, Louisiana, and Maury A. Herman, Herman, Herman, Katz & Cotlar, New Orleans, Louisiana, Counsel for Plaintiff/Appellant.
John B. Gooch, Richard E. McCormack, Brigid B. Glorioso, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, Louisiana, Counsel for Defendant/Appellant (Coastal Cargo Company, Inc.)
Edward J. Lilly, William L. Crull, III, Crull, Castaing & Lilly, New Orleans, Louisiana, Counsel for Defendant/Appellant (James Farrow).
Kathy Lee Torregano, Berrigan, Litchfield, Schonekas & Mann, LLC, New Orleans, Louisiana, Intervenor/Appellee.
Court composed of Chief Judge ROBERT J. KLEES, Judge MOON LANDRIEU, Judge PATRICIA RIVET MURRAY.
MURRAY, Judge.
The parties to this appeal are plaintiff Clodie Brumfield, defendant James Farrow, the person with whom plaintiff engaged in a fistfight resulting in his injury; defendant Coastal Cargo Company, Inc., Mr. Farrow's employer; and intervenor Louisiana Insurance Guaranty Association, the workers compensation carrier for Mr. Brumfield's employer, Triple E Transport. Plaintiff Brumfield appeals, assigning several errors with regard to the trial court's award of attorney's fees to LIGA. Defendant Farrow appeals claiming that the trial *637 court erred in finding him to be the aggressor in the altercation between him and Mr. Brumfield. Defendant Coastal Cargo appeals claiming that the trial court erred in finding it to be vicariously liable for Mr. Farrow's actions because the fight with Mr. Brumfield was in no way related to his employment.
For the following reasons, we affirm the judgment, as amended, and remand.

FACTS:
Mr. Brumfield was employed as a truck driver for Triple E Transport. On January 25, 1991, he was dispatched to Coastal Cargo's yard at the Poland Street wharf to receive a shipment. Mr. Brumfield arrived during the lunch hour, and was waiting on the platform outside the shipping clerk's office to present his paperwork, and for a lift operator to be assigned to load his truck. Mr. Farrow, with several co-workers, passed near the platform on his way back from lunch. As he did, Mr. Brumfield addressed him in a vile and derogatory way, and inquired as to when Mr. Brumfield was going to load his truck. Mr. Brumfield does not deny using a derogatory term to address Mr. Farrow, but testified that he believed the term was Mr. Farrow's nickname. Mr. Farrow denied that he had such a nickname.
Mr. Brumfield testified that after he addressed him, Mr. Farrow reached down under the platform, retrieved a hammer from a gallon bucket, and struck him in the left temple area of his head. Mr. Farrow then told Mr. Brumfield to come down from the platform, which he did, despite his blurry vision and bleeding head. The men exchanged punches, although Mr. Brumfield claimed that Mr. Farrow threw the first punch. The fight was broken up shortly thereafter, but Mr. Brumfield did not know by whom.
Mr. Farrow testified that he asked Mr. Brumfield to apologize for having called him called him a vile name. At that point, Mr. Brumfield came off the platform and the two men began to fight. Mr. Farrow admitted that he told two investigators[1] that he invited Mr. Brumfield to come down off the platform, but he stated that he was not under oath when he made that statement. In his deposition, Mr. Farrow denied speaking to Mr. Brumfield at all because he was trained not to speak to the truck drivers. At trial, he explained that he did not speak to Mr. Brumfield about loading his truck, but did ask for an apology for being called a vile name. Mr. Brumfield refused, came down from the platform, and they began fighting simultaneously.
During the course of Mr. Brumfield's testimony, it was disclosed that he had continued to collect workers compensation benefits despite the fact that he had been employed since April of 1991. Mr. Brumfield stated that he believed he was entitled to these benefits because he needed them to supplement his part-time pay. He testified that he did not go back to work for Triple E, his employer at the time of the incident, because headaches caused from the blow to his head prevented him from being able to drive long distances. However, on cross-examination, he admitted that he worked from April of 1991 until sometime in 1996 for a charter bus company driving customers to the casinos on the Gulf Coast, and at least two times to Orlando, Florida.
It was stipulated at trial that LIGA and the predecessor workers compensation carrier had paid a total of $102,964.83 in medical bills and indemnity payments for Mr. Brumfield's benefit. Also, during trial, Mr. Brumfield dismissed his claim for loss of earnings and loss of earnings potential.
The trial court ruled in favor of Mr. Brumfield, awarding him $200,000 in general damages, $33,721.00 in past medicals, *638 and $4,500 in future medicals. The trial court also awarded intervenor LIGA $102,964.83 for payments made on behalf of Mr. Brumfield, and $15,000 in attorney's fees. All amounts awarded were with judicial interest from date of demand. In reasons for judgment, the trial court stated that it found Mr. Farrow was the aggressor in the altercation, and that after being struck, Mr. Brumfield came down from the platform and engaged in a fistfight. The court, however, specifically stated that "[a]bsent any corroboration, this Court will not accept plaintiff's statement that Farrow struck him with a hammer." Nonetheless, because Mr. Brumfield sustained a severe injury to his head, the trial court awarded him damages.

DISCUSSION:

A. Defendant James Farrow's Appeal:
Mr. Farrow appeals claiming that the trial court erred in finding him to be the aggressor in the altercation with Mr. Brumfield. Mr. Farrow points out that the trial court rejected Mr. Brumfield's testimony that he was struck with a hammer. Therefore, once that fact is rejected there remains no basis in the record to support the factual determination that Mr. Farrow struck the first blow. On this point, we find manifest error in the trial court's conclusion that Mr. Brumfield was not struck with a hammer or other sharp instrument.
Mark Reis, a paramedic who responded to the scene, testified that Mr. Brumfield told him he was struck with a hammer. He stated that the wound to Mr. Brumfield's head appeared to have been inflicted by a blunt instrument, not caused by a punch or a slap. He agreed that striking the edge of the wooden steps to the platform could have caused the wound, but he did not notice any wood particles when he cleaned the wound.
Dr. Kinnebrew, a plastic surgeon, first saw Mr. Brumfield three days after the incident and reconstructed his cheek. He testified by deposition that he found a small puncture wound on Mr. Brumfield's cheek and a stellate laceration, a starshaped laceration with multiple lines radiating from the center. Dr. Kinnebrew stated that Mr. Brumfield's wound was not consistent with a blow from a fist, unless there were "brass knuckles" or a heavy ring involved. The wound that he observed was most compatible with an injury caused by a sharp object of fairly small size. He did not believe that Mr. Brumfield's injury was caused by falling against the wooden steps of the platform. Therefore, we find, contrary to the trial court, that Mr. Brumfield was struck with some type of sharp instrument. However, that fact does not establish when Mr. Brumfield was struck.
Mr. Farrow asserts that the only basis for the finding that he was the aggressor is Mr. Brumfield's testimony. Mr. Farrow points out that because of the positions of the two men, regardless of which of Mr. Brumfield's versions of where he was standing one believes, it was physically impossible for him to have hit Mr. Brumfield in the side of his head while Mr. Brumfield was standing on the platform. When asked on cross-examination how Mr. Farrow, at five feet nine inches tall, hit Mr. Brumfield, also five feet nine inches tall, in the head while Mr. Brumfield was standing on a two foot platform, Mr. Brumfield replied that he did not know.
We agree that it is not possible that Mr. Farrow hit Mr. Brumfield in the head, with a hammer or any other instrumentality, while Mr. Brumfield was standing on a two-foot platform. The question remains, however, as to who was the aggressor in this altercation.
Mr. Brumfield testified as to the events surrounding the fight as follows:
Q. Point out to me or point out to the Court on these photographs hear [sic], where you were and where Mr. Farrow was at the time Mr. Farrow hit you with the hammer?

*639 A. I was standing up at the rail here and Mr. Farrow was standing at the bottom right here, and he hit me from here and I was up here.
Q. What happened after that?
A. Well, then I asked him why did he hit me and he told me to come on down and see what he had from his fist. And I came down off the ramp and down the stairs, and that's when we started kind of scuffling at each other.
* * *
Q. Who swung the first fist blow?
A. He did.
There were some discrepancies between Mr. Farrow's statement given to two private investigators on the job site, his deposition testimony, and his testimony at trial. Mr. Farrow explained that the statement given to the investigators was not under oath, he was at work at the time, and he just told them what they wanted to hear. At his deposition, he denied telling Mr. Brumfield to come down off the platform, because he was not supposed to talk to the truck drivers. At trial, Mr. Farrow described the actual physical altercation as follows:
Q. Now you don't know whether you hit Clodie Brumfield first, correct?
A. No. We hit each other.
Q. The question was asked at your deposition... "So I feltI don't know if I hit him first or what, because I just closed my eyes. When I fell, I just seenIf you know anything about fighting, I don't have to hit you to know I'm going to hit you if I'm up on you. You know what is going to happen. I am going to do it and you are going to do it." You made that statement in your deposition that you didn't know whether you hit him first or what?
A. I didn't. I don't.
Q. And you can't say who threw the first punch?
A. I think in reality we both threw the first punch.
Jurisprudence holds that a plaintiff is precluded from tort recovery when his actions are such that they provoke a reasonable person to use physical force in fear or anticipation of further injury at the hand of the aggressor plaintiff. Tripoli v. Gurry, 253 La. 473, 218 So.2d 563 (1969); LeVesque v. Saba, 402 So.2d 266 (La.App. 4 Cir.1981). A plaintiff is said to be the aggressor when he is at fault in provoking the altercation in which he was injured. Tripoli, supra; Harris v. Doucette, 539 So.2d 997, 998-999 (La.App. 4 Cir.1989). The provocation must be such that it causes a reasonable person to use physical force in fear or anticipation of further injury at the hand of the aggressor plaintiff. However, when the defendant uses excessive force in repelling the attack, the plaintiff may recover. Susananbadi v. Johnson, 97-91, p. 5 (La.App. 5 Cir. 9/17/97), 700 So.2d 886, 888; Baugh v. Redmond, 565 So.2d 953, 958 (La.App. 2 Cir.1990).
The issues of which party was the aggressor and whether excessive force was used in repelling the attack are questions of fact that must be determined from the peculiar facts and circumstances of each case. Tripoli, supra; Harris; supra at 999. The trial court in this case found that Mr. Farrow was the aggressor, and although this Court might believe its inferences from the facts are more reasonable than the fact finders, reasonable inferences of fact should not be disturbed on review when the record supports the trial court's findings. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989), on remand, 558 So.2d 1360 (La.1990), writ denied, 561 So.2d 105 (La. 1990). The trial court was in the better position to evaluate the testimony and resolved the conflicting testimony concerning the fight in favor of Mr. Brumfield. Were this Court to reverse the finding as to who was the aggressor, the fact remains that Mr. Brumfield was struck with some sharp object resulting in a fractured cheek. Use of such force under the facts of this case is unreasonable. Thus, because the record *640 contains sufficient support for the trial court's findings, we will not disturb that factual determination.

B. Defendant Coastal Cargo Company, Inc's Appeal:
Coastal Cargo assigns as error the trial court's finding that Mr. Farrow was in the course and scope of his employment with Coastal at the time he engaged in the fight with Mr. Brumfield.[2] It argues that on the day of the incident Mr. Farrow's duties did not include loading Mr. Brumfield's truck because he was assigned to a ship.
Mr. Farrow, Mr. Brumfield, and LIGA argue that Mr. Farrow was in the course and scope of his employment. They assert that even if one assumes that Mr. Farrow was only angry about the name-calling, the fact remains that his employment as a lift operator for Coastal, and Mr. Brumfield's job as a truck driver, is the reason the two men had contact that day.
The issue of vicarious liability is a mixed question of law and fact. As such, a determination by the trial court as to whether an employee's conduct is sufficiently related to his employee to impute liability to the employer, should be afforded great deference under the manifest error standard. Brasseaux v. Town of Mamou, 99-1584, p. 5 (La.2000), 752 So.2d 815.
The Louisiana Supreme Court instructs that to determine if an employee was within the course and scope of his employment, one must look to the time and place of the incident. Baumeister v. Plunkett, 95-2270, p. 3 (La.5/21/96), 673 So.2d 994, 996. An intentional tort committed by an employee during working hours will not render an employer vicariously liable unless the employee is acting within the "ambit of his assigned duties and also in furtherance of his employer's objective." Id. at pp. 3-4, 673 So.2d at 996. The "tortious conduct of the [employee must be] so closely related in time, place and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct instituted by purely personal considerations entirely extraneous to the employer's interest." LeBrane v. Lewis, 292 So.2d 216, 217-18 (La.1974)(emphasis ours).
Two of the four elements necessary for a finding of vicarious liability are present. The incident occurred on Coastal Cargo's business premises during the hours of Mr. Farrow's employment. Therefore, we must decide if the tortious conduct was primarily employment rooted and whether the incident was reasonably incidental to the performance of Mr. Farrow's duties as a lift operator. However, if the intentional act is motivated by purely personal considerations, the act will not be deemed to have occurred in the course and scope of employment. Baumeister, supra; McClain v. Holmes, 460 So.2d 681 (La. App. 1 Cir.1984), writ denied, 463 So.2d 1321 (La.1985); Scott v. Commercial Union Ins. Co., 415 So.2d 327 (La.App. 2 Cir.1982).
In Baumeister, a nursing supervisor, on the clock and on the hospital premises, sexually assaulted a co-worker. The Court found that the likelihood that a nursing supervisor would find an employee alone in the nurses' lounge and sexually assault her was "not a risk fairly attributable to the performance of the supervisor's duties." Id. at p. 9, 673 So.2d at 999. Further, the Court found that the sexual assault on the technician was "entirely extraneous to his employer's business." Id. at p. 9, 673 So.2d at 1000.
Thus, to find Coastal Cargo vicariously liable for Mr. Farrow's actions it must be established that those actions *641 were reasonably incidental to the performance of his duties with Coastal of loading and unloading trucks and ships, or his actions were primarily related to that business. Id. at p. 10, 673 So.2d at 1000.
Mr. Farrow was employed by Coastal Cargo as a lift operator, a job that included loading and unloading trucks and/or vessels in port. He testified that he was assigned to a vessel on the day of the incident, and was not assigned by the shipping clerk to load Mr. Brumfield's truck. He testified, and Mr. Brumfield verified, that he had loaded Mr. Brumfield's truck on previous occasions. Mr. Farrow further testified that, although there were other lift operators at work, he was the one who would load Mr. Brumfield's truck. In his deposition, Mr. Farrow testified, "I was the only operator to load trucks, because you got plenty of operators, but everybody can't load trucks, because that's a lot of responsibility."
Wallace Binford, a vice president for Coastal Cargo's parent company, refuted Mr. Farrow's testimony. He testified that on a normal day, Coastal would employ as many as six terminal lift operators to service the volume of business.
At the time the incident occurred, Mr. Farrow and several co-workers were returning to work after lunch, and passed near the shipping clerk's trailer. After Mr. Brumfield addressed Mr. Farrow with the derogatory phrase and inquired as to when he was going to load his truck, he approached the platform and asked for an apology for the name-calling, not for being asked to load the truck. Mr. Farrow explained that he had no control over assignments for truck loading, as that was the job of the shipping clerk, and, at the point the fight ensued, he had not been assigned. After the fight, Mr. Farrow went back to the ship to which he was assigned that day.
Wallace Binford testified that the policy manual given to new employees contains a provision for fighting. This provision prohibited "[f]ighting or assaulting any person while at work or at any time and under any circumstances, where such conduct might embarrass the company with customers or the public, or would create ill will among employees, or using profanity or abusive language under the same circumstances." Mr. Binford thought that Mr. Farrow had been instructed that it was not his position to deal with truck drivers. Mr. Farrow explained that the reason for the policy was because Coastal did not want the lift operators to become familiar with the truck drivers or to grant them special favors.
The inference to be drawn, therefore, is that the possibility of fighting was a risk of harm fairly attributable to Coastal Cargo's business, and the trial court's finding of vicarious liability.

C. Plaintiff Clodie Brumfield's Appeal:
Mr. Brumfield appeals only the portion of the judgment awarding LIGA total reimbursement for workers' compensation payments paid, and an additional $15,000 in attorney's fees.
It was stipulated at trial that LIGA and the predecessor workers' compensation carrier, had paid to or on behalf of Mr. Brumfield' $33,721.23 in medical payments and $69,243.60 in indemnity payments. At oral argument, it was stipulated that LIGA was due interest on payments made as of the date of filing the petition of intervention, and on payments made thereafter as paid. Further, any award of attorney's fees should be assessed as a credit against any fees awarded pursuant to Moody v. Arabie, 498 So.2d 1081 (La.1986).
Mr. Brumfield argues that the trial court erred in not reducing the judgment in intervenor's favor to reflect its proportionate share of the reasonable and necessary costs of recovery. The Court further erred in awarding attorney's fees to counsel for LIGA. LIGA counters that it is entitled to full recovery of all payments made on Mr. Brumfield's behalf, and that *642 the $15,000 attorney's fee award should be upheld.
The controlling case on this issue is Moody v. Arabie, supra, in which the Court held that the employer or workers' compensation carrier may be charged with a proportionate share of the reasonable and necessary costs of recovery, including attorney's fees, incurred by the injured worker in the suit against the third person. 498 So.2d at 1083. The intervenor's proportionate share is calculated as the ratio that the amount of compensation paid or due at the time of recovery bears to the total recovery. Id. at 1086. That percentage is then applied to the cost of recovery by the worker to arrive at the portion the intervenor is bound to pay. Also see, Taylor v. Production Services, Inc. of Mississippi, 600 So.2d 63 (La.1992).
Louisiana Revised Statute 23:1103 C, as amended in 1989 and in effect at the time of this incident, provided:
If either the employer or employee intervenes in the third party suit filed by the other, the intervenor shall only be responsible for reasonable legal fees and costs incurred by the attorney retained by the plaintiff. Such reasonable legal fees shall not exceed one third of the intervenor's recovery for pre-judgment payments or pre-judgment damages. The employee as intervenor shall not be responsible for the employer's attorney fees attributable to post-judgment damages nor will the employer as intervenor be responsible for the attorney fees attributable to the credit given to the employer under Paragraph A of this Section.
Therefore, applying the principles set forth in Moody and La.Rev.Stat. 23:1103 C, the calculations are as follows: The recovery from the third party is $238,221.00. LIGA's share of that recovery is $102,964.83. The ratio of LIGA's recovery to the total recovery is 43%. Therefore, LIGA is responsible for 43% of the reasonable attorney's fees and costs incurred by Mr. Brumfield's attorney.
To qualify as a reasonable and necessary cost of recovery, the fee must relate to necessary services, which actually benefited or augmented recovery from the third person, rather than duplicative services or those designed to benefit a single party. Taylor, 600 So.2d at 67. This was a difficult case for plaintiff to win. There were no independent witnesses to the incident in question who would step forward to testify. There was conflicting testimony and evidence as to who was the aggressor in the altercation. The testimony at trial revealed that Mr. Brumfield continued to receive workers' compensation benefits despite his ability to return to work. The trial court specifically stated that such conduct was reprehensible. Nevertheless, the court found that Mr. Brumfield was severely injured in the altercation, a finding supported by the medical evidence gathered and presented by plaintiff's counsel, and rendered a substantial judgment in his favor. This finding obviously benefited Mr. Brumfield as well as LIGA.
Mr. Brumfield entered into a contingency fee contract with his attorney providing that the attorney would be entitled to 40% of the amount recovered. A court may consider an attorney-client contract when deciding a reasonable fee, however, it is not bound by such an agreement. Moody, supra at 1086. In light of the above, we conclude that a 40% contingency fee is reasonable.
Having reached this conclusion, we must calculate LIGA's proportionate share of the fee. Based on a 40% contingency fee, the attorney's fees in this case are $95,288.40. LIGA's proportionate share (43%) is $40,974.01. However, by statute, LIGA's share cannot exceed one-third of its recovery for pre-judgment payments or damages. Accordingly, LIGA's statutory share is $33,978.40.
In its judgment, the trial court awarded LIGA full recovery of all benefits paid on Mr. Brumfield's behalf, and an *643 additional award of $15,000 in attorney's fees. The reasons for judgment infer that LIGA is entitled to this additional award because of Mr. Brumfield's continued acceptance of benefits after he returned to work. There is no statutory or jurisprudential provision for awarding attorney's fees as a penalty. However, a trial court may award an intervenor attorney's fees for non-duplicative participation in the prosecution of the claim.
Our review of the record reveals that, although counsel for intervenor did not participate at trial except to introduce stipulations on benefits paid, she did participate in depositions, and filed both posttrial memoranda and appeal briefs in support of Mr. Brumfield's claims against James Farrow and Coastal Cargo. Additionally, she argued before this Court in support of Mr. Brumfield's claims. Considering the trial and appellate work done by counsel for LIGA, we cannot say that a $15,000 attorney's fee award is unreasonable. This award is to be credited against LIGA's proportionate share of the attorney's fees. See Taylor, supra.
Thus, LIGA's share of a reasonable attorney's fee is calculated as follows: The total amount of recovery was $238,221.00. Forty percent of that amount is $95,288.40. Aetna's proportionate share, after applying the statutory cap is $33,978.40. Subtracting $15,000 for non-duplicative legal services leaves a balance of $18,978.40, the amount owed by LIGA.
The issue of costs of litigation cannot be resolved on this record. La.Rev.Stat. 23:1103 C places a cap only on the amount of attorney's fees for which an intervenor may be held responsible. Norris v. Goeders, 26,130, p. 7 (La.App. 2 Cir. 3/10/95), 652 So.2d 144, 148. Accordingly, LIGA is responsible for 43% of litigation costs incurred by Mr. Brumfield. However, the record does not contain any evidence of the costs of litigation, nor does the judgment indicate clearly by whom the costs should be borne. Therefore, this matter is remanded for the sole purpose of clarifying what costs were incurred, by whom costs are to be paid, and assessing LIGA with its proportionate share in accordance with this opinion.
Accordingly, the judgment is amended to assess LIGA with its proportionate share of attorney's fees, and the case is remanded for an assessment of costs and allocation of payment. Otherwise, the judgment is affirmed.
AFFIRMED, AS AMENDED, AND REMANDED.
LANDRIEU, J., dissents in part.
LANDRIEU, J., dissenting in part.
I respectfully dissent from the majority opinion insofar as it affirms the trial court's finding that defendant Coastal Cargo was vicariously liable for Farrow's actions. Unlike the majority, I do not find the tortious conduct was primarily employment rooted. Farrow's altercation with the plaintiff was entirely extraneous to Coastal Cargo's interests and furthered none of its objectives. Farrow testified that he was personally insulted and embarrassed when the plaintiff called him an "old pussy ass nigger." He intended to remedy his own embarrassment by demanding the apology and engaging in the fight with the plaintiff. Clearly, Farrow was motivated by purely personal concerns when the altercation commenced.
Also, I do not find Farrow's actions were reasonably incidental to the performance of his employment duties as a forklift operator. Farrow's specific duties never included scheduling the loading of Coastal Cargo's customers' trucks or assigning employees to perform that task. Rather, it was the trailer clerk's duty to arrange for those services. Nonetheless, it is clear from the record that, at the time of the altercation, Farrow was neither loading plaintiff's truck nor operating the forklift. Under these circumstances, I believe the majority errs in holding Coastal Cargo vicariously liable for Farrow's actions.
*644 I agree with the majority opinion in all other respects.
NOTES
[1] It is apparent from the record that these were not police investigators, but it is unclear who employed them.
[2] Coastal also assigns as error the trial court's finding that Mr. Farrow was the aggressor. That issue was discussed infra.