liAMY, Judge.
The defendant appeals his conviction for second degree murder arguing that the State failed to offer evidence sufficient to support the conviction. He also contends that the State made improper references to the sentencing guidelines for manslaughter during closing arguments. For the following reasons, we affirm.
Factual and Procedural Background
This matter involves the July 5, 1997 death of Christine Simon. At the time of the incident that led to her death, Ms. Simon and her young daughter were at her parents’ home in Hackberry, Louisiana. At approximately 1:00 a.m. on that date, Ms. Simon’s sister-in-law, Julia Simon, and Hope Walding drove to the Simon home with the intent of retrieving some items from the garage for an upcoming trip. The women testified that as they arrived at the home, there was a light-colored van backing from the driveway. It passed them on the road.
Julia testified that when she entered the house, she saw Ms. Simon on the floor with the phone pulled to her. The child was on a nearby recliner crying. Julia stated that she instructed Ms. Simon to get up from the floor and, when she did not, she walked over to her, seeing blood. Julia called 911 while Ms. Walding took the child outside. Deputies from the Cameron Sheriffs Department and emergency personnel arrived, taking Ms. Simon to the hospital. She was later pronounced dead.
According to testimony from the coroner performing the autopsy, Ms. Simon sustained a variety of wounds, including a six-inch wound across her neck, deep enough to cut her voice-box. The coroner testified that the wound was produced by a serrated knife. He also testified that Ms. Simon had sustained cuts on her left hand and wrist consistent with defense wounds. He opined that she most likely bled to death.
| ¡According to the testimony of Deputy Jerry Constance, Chief Investigator with the Cameron Parish Sheriffs Department, Julia informed him that the van she had seen leaving the residence was similar to one owned by the mother of the defendant, Joshual Brown. The record indicates that the defendant and the victim had an on-again, off-again relationship, a relationship that resulted in the birth of the young child mentioned above. Officials sought the defendant, who came in for questioning.
Deputy Constance requested the assistance of Detective Donald “Lucky” De-louche, Director of the Violent Crimes Task Force of Calcasieu Parish. Detective Delouche testified that he and Deputy Constance interviewed the defendant on July 6, 1997. According to Detective De-louche, the defendant admitted having driven his mother’s van from the camp where they were staying in Crystal Beach, Texas, to Sulphur, Louisiana to search for Ms. Simon. He first stated that he went to two bars searching for her, including the Corner Bar in Sulphur, and that he ultimately returned to Texas. Although he first denied going to the home in Hack- *539 berry, after being informed that there was a witness, he admitted going to the home, but denied going inside. He stated that he went to the house, saw her ear, waited approximately five minutes, and then left.
Deputy Constance confirmed at trial that the defendant gave varying accounts of his whereabouts on the night of the murder and also confirmed that the defendant denied going into the house. Deputy Constance also testified that, following the interview, he obtained security videotapes from the Corner Bar in Sulphur, Louisiana. The tapes demonstrate the van leaving the parking lot at 12:23 a.m. and returning to the bar at 1:34 a.m. Videotapes from inside the bar also confirmed the defendant’s presence.
[ ¡¡Following the interview with Deputy Constance and Detective Delouche, the defendant was arrested, his clothing and the van seized.[1] His clothing and the van were seized and examined. DNA testing performed on blood samples found on the defendant’s shoes and in the van revealed the presence of blood that, according to the testimony of an expert in the field of DNA profiling and molecular biology, was likely that of Ms. Simon.
In addition to the testimony of Deputy Constance and Detective Delouche regarding the defendant’s statements, the State presented the testimony of two inmates with whom the defendant was jailed following his arrest. Kermit Sonnier stated that the defendant told him that he was in jail for killing his girlfriend. Sonnier testified that the defendant informed him that: “ T did it, but they can’t prove it,’ because all they could find is hair, cigarette butts and fingerprints at the young lady’s mother’s house.” Kent Ness, also in jail with the defendant, testified that the defendant told him that he had killed his girlfriend, describing the event. Ness stated that the defendant informed him that, on the night of the murder, he was talking to Ms. Simon in the living room, went to use the bathroom where he flushed the toilet with his knuckle, proceeded to the kitchen where he picked up a knife and put it into his back pocket, returned to the living room, and cut Ms. Simon’s throat. Ness informed the jury that the defendant told him that he later threw the knife off of the Ellender Bridge. Ness told the sheriffs department of the information regarding the knife.
Deputy Constance testified that in September 1997, he went to the Ellender Bridge to examine the scene to prepare for an upcoming search for the knife and 14f'ound a knife on the edge of the bridge, outside of the travel lane. He stated that Grace and Larry Simon, Ms. Simon’s parents, informed him that it looked like one missing from their knife set. At trial, Grace Simon again identified it as looking like one of their knives.
In its closing statement, the defense argued that the State failed to prove specific intent to kill Ms. Simon. Rather, the defense argued, the circumstances of the couple’s relationship, the choice of weapon, and the wounds inflicted, along with other evidence, indicated that the crime was not premeditated. The defense argued that the physical evidence supported a conviction for manslaughter.
The jury found the defendant guilty as charged. He was subsequently sentenced to a life term without the possibility of parole, probation, or suspension of sentence,
The defendant appeals, assigning the following as error:
1. The trial court erred in denying defendant’s request for mistrial after the State’s improper rebuttal closing argument.
2. The evidence adduced at trial was insufficient for any rational trial jury to reasonably conclude that the prosecution *540 had proved beyond a reasonable doubt that the requisite presence of the essential element of specific criminal intent was not mitigated by the state of mind of the defendant at the time of the offense charged.
Discussion

Errors Patent

Following the patent error review required by La.Code Crim.P. art. 920, we observe that the defendant was not informed of the two-year time limit for filing post-conviction relief as required by La. Code Crim.P. art. 930.8. Accordingly we remand this matter and instruct the trial court to inform the defendant in writing that, pursuant to La.Code Crim.P. art. 930.8, he has two years from the date his judgment and ^sentence become final to apply for post-conviction relief. This notice should be sent to the defendant within ten days of the rendition of this opinion. We further instruct the trial court to file written proof of the defendant’s receipt of the notice into the record of the proceedings. See State v. Porter, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115.

Sufficiency of the Evidence

We first address the defendant’s contention that the evidence at trial was insufficient for a rational jury to conclude that the prosecution proved beyond a reasonable doubt that the element of specific criminal intent was not mitigated by the defendant’s state of mind at the time of the offense. He contends that a finding that he did not act in the heat of blood or sudden passion is clearly contrary to the evidence. In his brief to this court, the defendant argues that “[t]he evidence is undisputed that Joshual Brown stabbed Christine Simon, resulting in the death of Christine Simon. The only question is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence.” He further states that “[t]he jury’s determination that Joshual Brown did not act in the heat of blood or sudden passion is clearly contrary to the evidence.” We disagree.
Second degree murder is the killing of a human being “[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]” La.R.S. 14:30.1(A)(1). Manslaughter, a responsive verdict to second degree murder, is defined, in part, as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had factually cooled, or that an average person’s blood would have cooled, at the time the offense was committed!/]
La.R.S. 14:31(A)(1). As explained by the Louisiana Supreme Court in State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, “sudden passion” and “heat of blood” are not elements of manslaughter. “Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors.” Id. at p. 4, 837-38. If a defendant establishes, by a preponderance of the evidence, the presence of these mitigating factors, he or she is entitled to a verdict of manslaughter. Id. See also State v. Lombard, 486 So.2d 106 (La.1986).
In evaluating the sufficiency of the evidence, we determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have concluded that the mitigatory factors of “sudden passion” or “heat of blood” were not established by a preponderance of the evidence. Snyder, 98-1078, 750 So.2d 832. We point out that the *541 presence of specific intent, which is the crucial question we focus on here, may be inferred from the circumstances surrounding the offense and the defendant’s conduct. State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 642, cert. denied, — U.S. -, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).[2]
Our review of the record indicates ample evidence upon which the jury could have relied in finding the existence of specific intent and no evidence that required the jury to determine that mitigating factors existed. Much of the evidence presented by the State involved the defendant’s actions and statements before and after the 17murder. As we explain below, this evidence supports the finding of specific intent to kill and undercuts a theory of “sudden passion” or “heat of blood.”
Leann Kirkland, who had previously dated the defendant, testified that she saw the defendant in his car at the Corner Bar on the weekend before Ms. Simon was killed. She stated that the defendant told her that Ms. Simon had left the bar with someone, her car was still there, and “he was wanting to know where she was and who she was with.” He informed her that he waited in the parking lot “[a]ll day long Saturday and until Sunday till her mother c[a]me to pick her car up.” Kirkland further testified that the defendant came to her house a few days before Ms. Simon’s death and told her that the victim did not want to see him anymore. Kirkland testified that the defendant was upset, crying and emotional.
Ms. Simon’s mother, Grace Simon, also testified about the defendant’s presence in the parking lot of the Corner Bar, explaining that she picked up the car at the bar on the Sunday before her daughter’s death. She stated that she spoke with the defendant and that he wanted to know where Ms. Simon was. Grace Simon testified that the defendant told her he had to do something to the car before she could leave with it. She stated that she saw a spark plug wire on the seat of the defendant’s car and then saw the defendant do something under the hood of the car.
Scarlett Deshotels also saw the defendant on the weekend prior to Ms. Simon’s death. She stated that the defendant told her he was looking for the victim, wanted to know who she was with, and was concerned that she was with another man. Deshotels testified that the defendant was upset, pacing, and in a panic because he could not find her. Deshotels testified that, on this weekend prior to Ms. Simon’s death, the defendant said he would “get” the victim if another man was involved. Deshotels stated that the defendant called her at approximately 3:30 a.m. on the | «morning after Ms. Simon’s death, wanting to know where the victim was and saying that he had gone to the Simon house earlier. Deshotels testified that he called her later that day and denied going to the house the night before.
Michael Castille, a bartender at the Corner Bar, testified that the defendant came to his house looking for Ms. Simon a few days before her death. Castille testified that the defendant mentioned he had removed a wire from the victim’s car to prevent her from moving it from the bar parking lot and said he pitied the person the victim was with. Castille also testified that he saw the defendant around midnight prior to Ms. Simon’s death and that he looked pale, upset, and a little confused. Castille stated that, after he told the defendant to be careful, the defendant stated: “I don’t give a f — .” When another patron at the bar standing next to them stated: “Well, you just don’t care,” the defendant responded: “You don’t know who you’re messing with[.]” The defendant then left the bar. Castille also stated that beginning at 1:30 a.m. that morning, the defendant called him approximately ev *542 ery hour for the next few hours, inquiring as to whether Ms. Simon was at the bar, if he had seen her, or if she had called. The defendant told him that if they saw Ms. Simon, to inform her that he loved her.
Jodi Thomason, who stated that she was Ms. Simon’s best friend, testified that she saw the defendant and Ms. Simon arguing at a bar a few weeks before the victim’s death, and she heard the defendant say: “If I can’t have you, nobody will.” Similarly, Lloyd Richard, who had dated Ms. Simon, was approached by the defendant the night before Ms. Simon’s death at a service station. He testified that the defendant said that if he could not have the victim, then nobody could. Richard was accompanied at the service station by his nephew, Jody Moore. Moore also | (testified and confirmed that the defendant stated that “if he couldn’t have her, nobody will.”
Further, Frank Backhand testified that he had a relationship with Ms. Simon which began a week before her death when she spent the weekend with him. Backhand testified that during that week, the defendant came to his home while Ms. Simon was there and repeatedly questioned them about their relationship and demanded to know if the relationship was sexual. Backhand testified that when Ms. Simon told the defendant her relationship with the defendant was over, he told her, “Well, if I can’t have you, then nobody will.”
The jury also heard the testimony of Margaret Neenan, an employee of a bar in Sulphur. She testified that approximately a week before the crime, she saw the defendant participate in a discussion about the O.J. Simpson trial and that he went behind a bar patron “to act like he was cutting a girl’s throat and saying that, you know, that’s how he would do it and not cut his glove and, you know, ... not make a mistake.” Neenan testified that although the bar patron was not scared when the defendant performed this demonstration, the defendant was not joking.
As stated above, fellow inmates of the" defendant, Kermit Sonnier and Kent Ness, testified to defendant’s statements after his arrest. Sonnier testified that the defendant stated: “ T did it, but th'ey can’t prove it[.]’ ” Ness testified that the defendant told him he was talking to Ms. Simon and then went to the bathroom where he flushed the toilet with his knuckle without knowing why he did this.
One of the defendant’s letters admitted into evidence was to Tonya Hoffpauir. Hoffpauir, who testified she had last seen the defendant in June 1996, stated that the defendant began writing to her four or five months before his trial. In the letter, the | indefendant wrote that what happened that night was not intentional, he also indicated that he did not lose his head or “flip out.”[3]
In performing the sufficiency review, we are mindful that it is the function of the trier of fact to make credibility determinations and, within the bounds of rationality, it is able to accept or reject the testimony of any witnesses. State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, cert. denied 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999). Bearing this standard in mind, we conclude that the evidence presented at trial supports the jury’s verdict of second degree murder, ie., a finding of specific intent. There is no evidence requiring the jury to find the presence of mitigating factors that would support only a conviction of manslaughter.
Importantly, the defendant’s argument in this regard lacks any identification of the provocation which would have caused his sudden passion or heat of blood. Perhaps the defendant is claiming (as his letter to the Hesters indicates), that the provocation was the victim telling him *543 about “her and Frank [Backlund].” Even without the overwhelming evidence that the defendant was suspicious or even aware that Ms. Simon was in some kind of relationship with another man at the time he went to Backlund’s home, there is no requirement that the jury find that this serves as sufficient provocation to justify a manslaughter verdict. Rather, the jury was free to find that, even if the defendant was angered over this type of knowledge, he had In ample time over the course of several days to reflect on the end of his relationship with Ms. Simon and her new relationship with someone else.[4]
In sum, the jury was free to determine, on this evidence, that the State established beyond a reasonable doubt that the defendant was guilty of second degree murder. The defendant’s own inconsistent statements to the police and others, as well as his actions before and after the offense support a finding that the defendant sought out the victim and intended to kill her when he attacked her with a kitchen knife, slashed her throat, and he fled the scene.
Accordingly, this assignment lacks merit.
| ^Motion for Mistrial
 The defendant also argues that the trial judge erred in denying his request for a mistrial after the State made an improper comment during its rebuttal closing argument. The closing arguments focused on whether the defendant was guilty of second degree murder or manslaughter. During the State’s rebuttal closing argument, the prosecutor stated:
It’s time that you have to make the decision. It’s your choice. I again urge you to look at all the evidence; if you do, I think you’re going to be convinced that it’s second degree murder. Nothing else. “Would like to think that I lost my head or flipped out or something,” his own words. It is not manslaughter. His own words tell you that.
You’ve got to go into the jury room in a few minutes. You’ve got to make a decision. Is it manslaughter, maximum 40 years, good time out in 20 years, and he walks the streets?
[DEFENSE ATTORNEY]: Objection, Your Honor.
[PROSECUTOR]: Is that what the evidence shows?
*544 THE COURT: Please no comment on
what that sentence might be. [PROSECUTOR]: Yes, sir.
Shortly afterwards, at a bench conference, the defense attorney requested a mistrial, contending that the prosecutor’s comment about the Defendant “being out of jail in 20 years [was] highly prejudicial.” The trial judge denied the motion for mistrial.
The scope of closing arguments is addressed by La.Code Crim.P. art. 774, which provides:
113The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state’s rebuttal shall be confined to answering the argument of the defendant.
According to the Louisiana Supreme Court in State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136. L.Ed.2d 106 (1996), even if beyond the scope of Article 774, the remarks do not constitute reversible error unless the appellate court is firmly convinced that the remarks influenced the jury and contributed to the verdict. See also State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022. The Court has further stated that much credit should be accorded to the good sense and fair-mindedness of jurors who have seen the evidence, heard the argument, and have been instructed that the arguments of counsel are not evidence. State v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250, cert. denied, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996). In the instant case, the State’s remark does not fall within the mandatory mistrial provisions of La.Code Crim.P. art. 770.[5] Accordingly, we turn to consideration under La. Code Crim.P. art. 771, which provides, in part:
|14In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, »in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770....
[[Image here]]
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
In the instant case, the defendant did not request that the trial judge admonish the jury to disregard the remark. However, responding to the defendant’s objection, the trial judge admonished the prosecutor, in front of the jury, to refrain from commenting on possible sentences. In State v. Bates, 495 So.2d 1262 (La.1986), *545 cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987), a similar admonition to the prosecutor was found to be sufficient under the facts of that case. The Court observed:
Defendant’s counsel immediately objected and asked the judge to limit the prosecutor’s arguments to the case before them. The judge agreed with the objection, told the prosecutor to speak only to the particular individual, and allowed argument to continue. The prosecutor made no further general references, as he did above. Defense counsel’s objection did not include a request that the jury be told to disregard the comments. The objection served its purpose: the prosecutor confined his remarks to the Bates trial.
[[Image here]]
We do not find the prosecutor’s remarks in the present case rise to the level of reversible error. We are not convinced, considering the prompt objection and the court’s ruling, the prosecutor’s remarks influenced the jury and contributed to the verdict. A major portion of the remarks giving rise to the objection constituted a factual commentary on defendant’s background. The general references terminated with the court’s admonition to counsel.
Id. at 1273-74.
|1sThe cases cited by the defendant in his argument that the conviction should be reversed, involve references to “future remedial measures” or those conditions under which a person sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence can be released at some time in the future. See State v. Lindsey, 404 So.2d 466 (La.1981), cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983) and State v. Copeland, 530 So.2d 526 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989).
In Lindsey, 404 So.2d 466, the defendant alleged it was error for the judge to give the jury an instruction on the governor’s pardon power. The Louisiana Supreme Court remanded for a new sentencing hearing, holding that conditions under which a person sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence can be released at some time in the future are not a proper consideration for a capital sentencing jury and should not be discussed in the jury’s presence. Id.
Other than to claim that the State’s remark is presumed prejudicial, the defendant in the instant case fails to specify how he was prejudiced. The jury verdict was unanimous and reasonable considering the evidence presented. Credit should be accorded to the good sense and fair-mindedness of jurors who have heard the evidence. Mitchell, 94-2078, 674 So.2d 250.
In this case the evidence clearly supported the charge of second degree murder and could not reasonably be interpreted to show a crime committed in “sudden passion” or “heat of blood.” Thus, the remark in closing argument, even if improper, did not influence the jury or contribute to the verdict such that a mistrial should have been granted. The jury’s verdict appears to be the result of the compelling evidence 11fiof the Defendant’s guilt, not the remark made by the prosecutor. We find no abuse of discretion in the denial of the motion for mistrial.
This assignment of error has no merit.
DECREE
For the foregoing reasons, the defendant’s conviction is affirmed. This case, is remanded and the district court instructed to inform the defendant that pursuant to La.Code Crim.P. art. 930.8, he has two years from the date his judgment and sentence become final to apply for post-conviction relief. This notice should be in writing and sent to the defendant within ten days of the rendition of this opinion. Written proof that the defendant received the notice is to be filed in the record of the proceedings.
*546 AFFIRMED; REMANDED WITH INSTRUCTIONS.

. On July 29, 1997, the defendant was indicted for first degree murder in the death of Christine Simon. On October 5, 1999, the charge was amended and the defendant in- • dieted for the second degree murder of Ms. Simon.

. La.R.S. 14:10(1) provides: "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.”

. In another letter, one written to Greg and Lisa Hester, the defendant detailed Ms. Simon’s murder, claiming that she approached him with the knife. The defendant also attempted to instruct its recipients with regard to their grand jury testimony.

. In Snyder, 98-1078, 750 So.2d 832, the defendant claimed that he came upon his estranged wife and the victim when they were engaged in a sexual act in the victim’s car. The defendant maintained that when he saw his wife involved in sexual relations with another man, he was provoked to the point of losing his self-control and cool reflection. The court found otherwise:
Defendant argues that "some evidence” was introduced that established that defendant committed the crime in sudden passion or heat of blood.... The defense argues the jury was aware of the marital difficulties between defendant and Mary Snyder, of Mary’s extramarital affair and instances of domestic abuse as a result of those affairs. Furthermore, the jury heard evidence that defendant wanted a reconciliation with Mary and that she was open to such a possibility. Finally, the jury was aware that defendant had paged Mary continuously before the murder in an attempt to contact her. The defense maintains that defendant’s discovery of his wife on a late date with the victim, after she had made reconciliation plans with defendant, sufficed to deprive him of his self-control and cool reflection.
Although "some evidence” presented at trial supported a conclusion that the victim and defendant’s wife were on a date, there was no evidence presented to support a. determination that the two Were involved in any type of sexual activity when defendant came upon them. Additionally, defendant’s conflicting accounts of the incident make it difficult to determine his true motivation for the act. Defendant told police one version of the events and defense doctors yet another. The conflicting accounts given by defendant after the murder do not constitute affirmative, substantive evidence of his guilt, ... but they undoubtedly undercut the reasonableness of the principal defense theory of manslaughter. Id. at p. 4-5, 838 (citations and footnote omitted).
Similarly, in the instant case, the jury may have determined that a reasonable person would not have been provoked to homicidal passion by hearing from a former girlfriend that she was involved with another man.

. La.Code Crim.P. art. 770 sets forth specific instances in which a trial court is required to order a mistrial. Article 770 provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1)Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury; (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare -a mistrial.