LOLLEY, J.
 

 | ]This criminal appeal arises from the Second Judicial District Court, Parish of Bienville, State of Louisiana. Robert Lee Johnson was convicted by a jury of two counts of second degree murder of his parents. La. R.S. 14:30.1. For each count he was sentenced to the mandatory sentence of life imprisonment at hard labor without benefit of probation, parole or suspension, to be served concurrently. Johnson now appeals. For the following reasons, we affirm Johnson’s convictions and sentences.
 

 Facts
 

 At approximately 5:00 p.m. on March 9, 2002, Reather Mae Cato, the defendant’s sister, drove toward the home of their parents, Ruby and David Johnson. She saw Johnson walking in the same direction. Cato offered to pick him up and give him a ride, but he declined and she went on without him. As Cato walked toward the porch of their house, she noticed that the front door of her parents’ home was ajar. She went into the house, calling for her parents. Receiving no answer, she made her way into the house and into her parents’ bedroom, where she found them both shot and dead on the floor. A shotgun lay next to their bodies.
 

 Cato phoned 911, her husband, and some of her siblings, then went back to the porch to wait for the police. As she got to the porch, the defendant was coming up the porch steps, and as she described at trial:
 

 And when he got on the porch, he got a chair off the porch and turned around and walked down the steps and set out there in the yard in the chair. And I said, “Come on in here in the house
 
 *700
 
 where I am.” I said “Come on in here.” I said, “Don’t you know Mama and Daddy are laying [sic] in here on the floor. Somebody done shot Mama and Daddy, and they in here on the floor dead.” And that’s when he said, “I did it.”
 

 12Johnson would not tell her why he had done it. Deputy James Stewart arrived shortly thereafter, and Cato told him what Johnson had said. Deputy Stewart went over and spoke to Johnson, who again admitted to the murders. Deputy Stewart then handcuffed Johnson and left him sitting in the lawn chair in the front yard.
 

 Johnson was arrested and originally indicted for the first degree murder of both of his parents. However, he was initially determined to be incompetent to stand trial. In the interim the charges against him were reduced to second degree murder. Johnson was subsequently found to have been restored to competency, tried before a jury, and convicted of two counts of Second Degree Murder. Afterward, Johnson was sentenced to the mandatory sentence of life imprisonment at hard labor without the benefit of probation, parole or suspension, for each count, to be served concurrently. Johnson now appeals his convictions.
 

 Discussion
 

 On appeal, Johnson raises two assignments of error.
 

 Sufficiency of the Evidence
 

 Johnson argues that the evidence at trial was not sufficient to convict him of second degree murder, and he should have been found not guilty by reason of insanity. Specifically, he maintains that the evidence presented was sufficient to show that he was insane at the time of the offense. Johnson points out that all the experts called to testify diagnosed him with schizophrenia, paranoid type, although they disagreed about whether he |:¡knew right from wrong at the time of the offense. For the following reasons, we do not believe the jury’s verdict was in error.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.05/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Murray,
 
 36,-137 (La.App. 2d Cir.08/29/02), 827 So.2d 488,
 
 unit denied,
 
 2002-2634 (La.09/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.02/22/06), 922 So.2d 517.
 

 The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Hill,
 
 42,025 (La.App. 2d Cir.05/09/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.
 
 State v. Allen,
 
 36,180 (La.App. 2d Cir.09/18/02), 828 So.2d 622,
 
 writs denied,
 
 2002-2595 (La.03/28/03), 840 So.2d 566, _|_4 2002-2997 (La.06/27/03), 847 So.2d 1255, cert.
 
 denied,
 
 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
 

 
 *701
 
 In Louisiana, a legal presumption exists that a defendant is sane at the time of the offense. La. R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La. C. Cr. P. art. 652;
 
 State v. Silman,
 
 1995-0154 (La.11/27/95), 663 So.2d 27, 32. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, the defendant must show he suffered a mental disease or defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14. The determination of sanity is a factual matter.
 
 State v. Sepulvado,
 
 26,948 (La.App. 2d Cir.05/10/95), 655 So.2d 623,
 
 writ den/ied,
 
 1995-1437 (La.11/13/95), 662 So.2d 465. All evidence, including expert and lay testimony, besides the defendant’s conduct and actions, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. Lay testimony concerning the defendant’s actions, both before and after the crime, may give the fact finder a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense.
 
 State v. Petera,
 
 1994-0283 (La.10/17/94), 643 So.2d 1222;
 
 State v. Claibon,
 
 395 So.2d 770 (La.1981).
 

 Expert testimony is relevant to the issue of whether a defendant is insane, but even where experts opine that the defendant is insane the issue is lr,for the jury to decide.
 
 State v. Horne,
 
 28,327 (La.App. 2d Cir.08/21/96), 679 So.2d 953,
 
 writ denied,
 
 1996-2345 (La.02/21/97), 688 So.2d 521.
 

 When a defendant who affirmatively offered the defense of insanity claims that the record evidence does not support a finding of guilty beyond a reasonable doubt, the standard for review by the appellate court is whether or not any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could conclude that the defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense.
 
 State v. Claibon, supra.
 
 Here, we conclude that the jury was clearly within its province in determining that Johnson failed to prove by a preponderance of the evidence that he was insane at the time of the murders.
 

 The jury heard the testimony of several lay witnesses who had seen Johnson on the day of the murders. Fannie Bailey Jenkins and Charlie Kennon both worked at the Fast Pak convenience store and witnessed Johnson’s strange behavior inside and outside the store that day. Johnson’s behavior ranged from dancing when no music was playing, to talking to inanimate objects, to walking very quickly back and forth in front of the store. Kennon also testified that Johnson tried to buy shotgun shells that afternoon and when he was told that all the store carried was BB pellets, Johnson said that they would not work for what he needed to do.
 

 Deputy Randy Price, one of the crime scene investigators, testified regarding his interview of Johnson at the sheriffs office soon after the murders. According to Dep. Price, Johnson told him he committed the murders because “he was tired of it. He had been harassed by his family, Dthat he was told that he was going to be locked back up.... ” Deputy Alonza Alford was also present during the interview with Johnson. She recalls Johnson’s explanation that his parents were “harassing me all the time. They stay on my case,” and that he “told my old man I was going to take him out the next time they try [sic] to lock me up.” He also told Dep. Alford
 
 *702
 
 that he told his parents “I was going to blow them away, and I did it. I have been telling them that I was going to do it.”
 

 Four of Johnson’s siblings also testified as to his varied behavior when he was on his medication and when he was off it. Each testified that Johnson “was a different person” when he was not taking his medication. One testified that there was no reasoning with Johnson when he was not on his medication and they all said that he would just constantly walk and talk to himself and point at things when he was not taking his medication.
 

 The state and defense also presented the testimony of five experts who had examined Johnson at various times in the approximately four years between the commission of the crime and the date of trial. George Seiden, M.D., an expert in psychiatry and forensic psychiatry, was called to testify on behalf of the state with regard to Johnson’s sanity at the time of commission of the offense, and he unequivocally opined that although Johnson was insane, he could distinguish between right and wrong. Dr. Seiden examined the defendant on March 11, 2003, and August 9, 2005, pursuant to his appointment to a sanity commission, to evaluate Johnson’s competence to stand trial. At his first evaluation of Johnson, Dr. Seiden found him to be competent to stand trial. He further found that, “... in this 17case, Mr. Johnson was psychotic. He suffers from a psychotic illness of schizophrenia, and he was psychotic at the time. But he knew what he was doing, and he knew that it was wrong.” After his second evaluation, he again found Johnson competent to stand trial and capable of distinguishing right from wrong at the time of the crime. When asked if the defendant’s failure to take his medication before the incident could have impacted his ability to tell right from wrong, Dr. Seiden testified, “Well, it could, but in this case, there’s no evidence that it did.”
 

 Webb Sentell, Ph.D., was called by the defense to testify as to Johnson’s state of mind at the time of the murders. Dr. Sentell was accepted as an expert in clinical and neuropsychology. He interviewed the defendant on April 17, 2003, and found Johnson competent to stand trial and “opined at that time, that in my opinion, he was not guilty by reason or [sic ] insanity at the time of the crime.” The state inquired of Dr. Sentell whether the fact that a person is delusional would prevent him from knowing the difference between right and wrong. Sentell responded, “No, but in my opinion, delusional thinking is ... is one of the most central criteria for a [not guilty by reason of insanity] issue.”
 

 Mark Vigen, Ph.D., was then called to testify as an expert in clinical psychology. Dr. Vigen determined that Johnson was competent to stand trial and that he initially thought that Johnson knew right from wrong at the time of the murders. However, at trial Dr. Vigen stated that he had changed his mind about his original conclusions: “Yes, I have reconsidered it, and I think at this point I doubt that he knew right from wrong at the time when |xhe killed his parents.” Nonetheless, Dr. Vi-gen was not entirely certain about this conclusion, either: “I’m not absolutely sure. I’m — if I were going to tilt a scale I’m coming down on the side of, uh, he did not know right from wrong. So I guess, in your terminology more probable than not. I would say it’s more probable than not he didn’t know. That would be my thought.”
 

 Johnson also called Paul D. Ware, M.D., who was accepted as an expert in forensic and
 
 general
 
 psychiatry, to testify as to his conclusions after examining Johnson on April 30, 2003. Dr. Ware concluded that Johnson:
 

 
 *703
 
 appeared to be acutely psychotic and hallucinating, and his perception of the situation was impaired, and his behavior was significantly affected by his serious mental illness and the command hallucination to shoot or kill his father and then her [sic] mother.... I again want to review the arrest report and other available information before reaching a final conclusion in regard to his awareness of the wrongness behavior at the time.
 

 Dr. Ware then stated that after listening to the testimony of the other doctors who had examined Johnson as well as the testimony of Johnson’s family members, he believed Johnson was incapable of distinguishing right from wrong at the time he committed the crimes.
 

 Richard Williams, M.D., also testified for the defense as an expert in psychiatry. He examined Johnson on June 15, 2005. He determined that Johnson knew right from wrong at the time of the commission of the offense. He further stated, “I have no question that Mr. Johnson was psychotic. I have no question that he was having hallucinations or that he had delusions. I don’t question that at all. What I believe is that he was not | ^insane to the point that he could not distinguish right from wrong with reference to the conduct in question.” The state reserved all questioning of this witness for rebuttal.
 

 On rebuttal, the state recalled Dr. Williams, who was subsequently accepted as an expert in forensic psychiatry as well. Dr. Williams testified:
 

 I concluded with reasonable medical certainty that, at the time of the alleged offense, Mr. Johnson, although suffering from mental disease, this disease did not render him incapable of distinguishing right from wrong with reference to the conduct in question. And by that, what I mean is he knew the difference in right and wrong. He knew the difference.
 

 [[Image here]]
 

 I ... base that on ... several things. Uh, Mr. Johnson said that he shot his parents because he did not want to go back to the mental hospital. That’s consistent with what’s he
 
 [sic
 
 ] said all of his life. “I’m tired of being in a mental hospital. If you’re going to send me to a mental hospital, I’m not going this time.” He said that he knew he would go to jail. That’s a caused event. He knew that if he did this behavior, this would occur. When asked if he would do the same thing now, he said that he would just leave. He knew that ends up in a ... bad place for him. Uh, he states, “This time I just got mad.” The psychological testing clearly indicates he’s impulsive and that he has anger outbursts. I think he was impulsive and got angry, and he acted this time. It was not because he feared for his life. You know, when someone is really delusional, aggressive psychotic, they think ... that somebody’s shooting at them, trying to kill them, and out of self-defense, they end up acting on that. I’ve seen people like that. You know, that’s a different deal. He feared for his life not at all. He didn’t want to be locked up again in a psychiatric hospital. “They have done this to me. They’ve had me locked up for twenty years” quote [sic]. When he saw his sister driving to the house and saw him, he knew that he would go to jail. And his siblings always sided with his parents. He knew that she was going to know that he had done it. He ... knew what would happen.
 

 Dr. Williams then explained the errors he believed the other doctors made in coming to the opposite conclusion. Regarding
 
 *704
 
 Dr. Sentell’s | mopinion, Dr. Williams noted that just because Johnson suffered from delusions and command hallucinations did not mean he could not tell the difference between right and wrong. He pointed out that the defendant had fought those urges for many years, which suggested to him that the defendant was aware that to follow them would be wrong. With regard to Dr. Vigen, Dr. Williams also thought that the issue is not a matter of more evidence placed on one side of a scale than on the other, rather, “Well, you know, you either say it or you don’t. And if ... it’s difficult to say it, then you ask for other information at that time.”
 

 Considering all of the evidence presented, the jury concluded that Johnson was sane at the time of the commission of the offense and found him guilty of both counts of second degree murder. The question for this court is whether, viewing all of that evidence in the light most favorable to the prosecution, the jury could have determined that Johnson failed to prove that he was insane by a preponderance of the evidence. Whereas the standard of proof for him to prove insanity is less than that required of the state to prove guilt, it is reasonable, viewing the evidence in the light most favorable to the prosecution, to determine that Johnson failed to meet his burden.
 

 The decision about which witness to believe belongs to the jury and should not be overturned by this court unless an abuse of discretion can be shown. Here, the jury could have believed one or two of the doctors over the others and found that the defendant failed to prove his insanity at the time of commission of the offense. Specifically, the testimony of Dr. Seiden | nwas very strong for the state, and it was not well challenged by the defense. The opposing opinions of Dr. Vigen and Dr. Ware appear, even on the cold record, hesitant and unsure. But finally, the rebuttal testimony of Dr. Williams was extremely clear and direct as to his belief that Johnson, even suffering from chronic paranoid schizophrenia, had the ability to distinguish right from wrong. Dr. William’s opinion cast great doubt on the reliability of some of the findings and opinions of the defense experts. The jury gave more credence to the opinions of Dr. Seiden and Dr. Williams, and such a determination was clearly within the jury’s discretion and reasonable in this case. Furthermore, in addition to the expert testimony the jury also considered the lay testimony of Deputies Price and Alford. They recounted that Johnson intended the consequences of his action-action he took because he did not want his parents to hospitalize him again. Weighing that testimony with the expert opinion testimony of Drs. Seiden and Williams, the jury’s verdict appears entirely reasonable. So considering, there is no basis for this court to substitute its opinion for that of the jury’s ultimate determination in this matter.
 

 Jury Selection
 

 Johnson also argues that his challenge for cause as to prospective juror, Melton Picket, was denied in error by the trial court. Specifically he argues that prospective juror Picket should have been released on a challenge for cause, because Picket’s deeply held beliefs were at odds with the law to be presented in the case. Johnson points to Picket’s statements that “murder is murder,” and “I believe that the Bible says if you kill | l2somebody, you die. That’s what I believe. Is that plain enough?” Johnson maintains that the requirements stated in
 
 State v. Robertson,
 
 1992-2660 (La.01/14/94), 630 So.2d 1278, 1281,
 
 (i.e.,
 
 the erroneous denial of a challenge for cause and the use of all his peremptory challenges) were met and so
 
 *705
 
 his conviction should be reversed. We disagree.
 

 Louisiana C. Cr. P. art. 797 provides the grounds for a challenge for cause of a potential juror:
 

 The state or the defendant may challenge a juror for cause on the ground that:
 

 (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
 

 [[Image here]]
 

 (4) The juror will not accept the law as given to him by the court....
 

 A defendant may raise a claim of wrongful denial of a challenge for cause on appeal if he has used all of his peremptory challenges and the trial court’s error in denying a challenge for cause “that results in depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence.”
 
 State v. Juniors,
 
 2003-2425 (La.06/29/05), 915 So.2d 291.
 

 A trial court is vested with broad discretion in ruling on challenges for cause, and a trial court’s ruling will be reversed only when a review of the entire voir dire reveals an abuse of discretion.
 
 State v. Carmouche,
 
 2001-0405 (La.05/14/02), 872 So.2d 1020. Although the trial judge has | abroad discretion, a challenge for cause should nevertheless be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied.
 
 Id.
 

 Here, the following two exchanges took place between the trial court, the state, defense counsel and Pickett (the prospective juror at issue) during and after the challenge for cause was raised:
 

 THE COURT: Mr. Pickett?
 

 COUNSEL FOR THE DEFENDANT: Yes. Mr. Pickett is the one that had a issue with, uh, ... that murder is murder and second degree is not strong enough. Uh, and so I don’t believe that he can fairly apply any testimony or ... THE COURT: ... Any objection to that, Mr. Davis?
 

 COUNSEL FOR THE STATE: Yes, sil', I object. Mr. Pickett says that he could apply whatever the law of the land was. Whatever you instruct him that the law was that he could apply that. I think that was a very honest answer and I don’t think that it’s sufficient for a challenge for cause.
 

 THE COURT: Do you want to rehabilitate him or not rehabilitate him or just that’s your answer?
 

 COUNSEL FOR THE STATE: That’s my answer .... (inaudible)....
 

 THE COURT: All right. I'll come back to that one.
 

 Later, the following exchange took place:
 

 THE COURT: Mr. Pickett, Mr. Davis has some questions to ask you.
 

 COUNSEL FOR THE STATE: Mr. Pickett, you stated earlier that you thought murder was murder. But you said that you could apply whatever the law of the land was, is that correct? Ii4MR. PICKETT: Yes, sir, that’s true. COUNSEL FOR THE STATE: So if Judge Fallin instructed you what the law was to second degree murder, you could apply that law in this case?
 

 
 *706
 
 MR. PICKETT: Yes, sir, I could.
 

 COUNSEL FOR THE STATE: And I believe you said that based on what the Bible said, the Bible says we’re suppose [sic] to apply the law of the land, is that correct?
 

 MR. PICKETT: That is right.
 

 COUNSEL FOR THE STATE: Okay. And if ... Judge Fallin told you what the law of insanity was.... If he told us what the law of insanity, what that was, you could apply that law also, is that correct?
 

 MR. PICKETT: Yes, sir, I could. COUNSEL FOR THE STATE: Okay. I have no further questions, Your Honor. COUNSEL FOR THE DEFENDANT: May I?
 

 THE COURT: Yes, sir.
 

 [[Image here]]
 

 COUNSEL FOR THE DEFENDANT: ... Mr. Pickett, you understand that when you first expressed them, I mean, you were rather adamant about your statements on murder is murder and second degree is not strong enough. Would you agree with that?
 

 MR. PICKETT: Yes, sir.
 

 COUNSEL FOR THE DEFENDANT: And would I be wrong in stating that that emphatic firm statement was a fair indication of how deeply held those beliefs were?
 

 MR. PICKETT: Yes, sir.
 

 COUNSEL FOR THE DEFENDANT: Now you understand that
 
 in
 
 a case where the crime charged is murder that there will often be subtle differences in the law on what constitutes first degree, second degree, manslaughter, negligent homicide and |13that these differences may be very narrow. Are you willing to listen and apply that even though the issue involved is the deaths of two people?
 

 MR. PICKETT: Yes, sir, I could do that.
 

 COUNSEL FOR THE DEFENDANT: Do you believe that you could in fact take evidence in the case where two people were killed and say that the facts of that case warranted a verdict of manslaughter?
 

 MR. PICKETT: Yes, sir, if that’s what the law says. Yes, sir, I could. COUNSEL FOR THE DEFENDANT: Even though the penalty for that is not life in prison nor is it death, you could accept that?
 

 MR. PICKETT: Yes, sir.
 

 COUNSEL FOR THE DEFENDANT: And I’ll — -well, that’s all I have, Judge. THE COURT: Mr. Pickett, do you think you can be a fair and impartial juror?
 

 MR. PICKETT: I do.
 

 THE COURT: Do you think that, or if I tell you what the law is by the fact that I’m telling you what it is at the end of the, if you do become a juror and I give you the instructions on the law, even though you personally may feel differently, my instruction to you would be that you have to follow what I say the law as to the facts as you find that, can you do that?
 

 MR. PICKETT: Yes, sir. There’s a lot of your laws I don’t like but still this is the greatest land in the world and we do have the best judicial system there is, and even though I don’t like it, I will follow whatever the law is.
 

 THE COURT: All right. Challenge for cause is denied.
 

 Here, Pickett initially stated during voir dire that “Murder is murder. I mean no matter how little bit of a sentence they get or whatever, whoever they killed is still dead.” He was subsequently questioned and stated that he 1^could “abide” by “the law of the land” and apply it as given to
 
 *707
 
 him by the court, even as the law specifically applied to an insanity defense. Although Pickett initially expressed his opinion that there were no different grades of murder, he ultimately stated that he could accept and apply the law. Refusal to sustain a challenge for cause of a juror who, though oscillating in his responses on voir dire concerning burden of proof, but firmly agreed to apply the law as instructed despite his personal beliefs is not an abuse of discretion.
 
 State v. Pettaway,
 
 450 So.2d 1345 (La.App. 2d Cir.1984),
 
 irndt denied,
 
 456 So.2d 171 (La.1984). Viewing the voir dire examination of Pickett as a whole, we conclude that although this prospective juror initially expressed reservations, his subsequent answers after further examination and instruction convinced the trial court that he would properly apply the law as instructed him on that issue. Therefore, it appears that this juror was sufficiently rehabilitated, and it was within the discretion of the trial court to deny Johnson’s challenge for cause. We conclude that this assignment is without merit.
 

 Conclusion
 

 For the foregoing reasons, the convictions and sentences of Robert Lee Johnson are affirmed.
 

 AFFIRMED.