DO NOT PUBLISH

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-993

STATE OF LOUISIANA

VERSUS

WILSON LOCKE, JR.

************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 11100-05
HONORABLE CLAYTON DAVIS, JUDGE

************

J. DAVID PAINTER
JUDGE

************

Court composed of J. David Painter, Phyllis M. Keaty, and John E. Conery, Judges.

**AFFIRMED.**

Edward K. Bauman
Louisiana Appellate Project
P.O. Box 1641
Lake Charles, LA 70602
COUNSEL FOR DEFENDANT-APPELLANT:
        Wilson Locke, Jr.

John F. DeRosier, District Attorney
Carla S. Sigler, Assistant District Attorney
Karen C. McLellan, Assistant District Attorney
901 Lakeshore Dr., Suite 800
Lake Charles, LA 70601
COUNSEL FOR APPELLEE:
        State of Louisiana

**PAINTER, Judge.**

Defendant, Wilson Locke, Jr., appeals his conviction for second degree murder. For the following reasons, we affirm.

## FACTS

On May 4, 2005, Defendant was living with his seventeen year old son, Sahara Locke, and his step-daughter, Serebia Dean, and her infant daughter. On that date, Defendant bought a shotgun and shells. Later the same day, he argued with his step-daughter over money. The argument concluded when Defendant shot her with the shotgun. Ms. Dean died immediately as a result of the gunshot wound.

Defendant was indicted for the second degree murder of his step-daughter, a violation of La.R.S. 14:30.1. On May 22, 2006, the trial court appointed a sanity commission, and on August 16, 2006, Defendant was deemed incompetent to stand trial and committed to East Feliciana Forensic Facility. In September 2009, Defendant was determined competent and able to assist his attorney at trial.

On February 10, 2010, Defendant changed his guilty plea to not guilty and not guilty by reason of insanity. A jury trial commenced on March 4, 2013, following which Defendant was found to be guilty of the crime of second degree murder. On March 13, 2013, Defendant was sentenced to life imprisonment without the possibility of parole, probation, or suspension of sentence.

Defendant has perfected a timely appeal, wherein he alleges that the evidence submitted was sufficient to show that he was insane at the time of the offense, and, therefore, insufficient to find him guilty of the offense. He also alleges that the trial court erred when it did not remove and replace a sleeping juror upon request of the defense.

1

# DISCUSSION

*Error Patent*

All appeals are reviewed for errors patent on the face of the record pursuant to La.Code Crim.P. art. 920. After reviewing the record, we find one error patent. Defendant's sentence for second degree murder was not imposed at hard labor, rendering it illegally lenient. La.R.S. 14:30.1. However, we will take no action because the error was not raised.

*Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to find him guilty of second degree murder, because he succeeded in establishing by a preponderance of the evidence that he was insane at the time he shot and killed his step-daughter.

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Tate*, 2001-1658 (La.05/20/03), 851 So.2d 921, *cert. denied*, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); *State v. Murray*, 36,137 (La.App. 2d Cir.08/29/02), 827 So.2d 488, *writ denied*, 2002-2634 (La.09/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 2005-0477 (La.02/22/06), 922 So.2d 517.

> The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Hill*, 42,025 (La.App. 2d Cir.05/09/07), 956 So.2d 758, *writ denied*, 2007-1209 (La.12/14/07), 970 So.2d 529. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La.App. 2d Cir.09/18/02), 828 So.2d 622, *writs denied*, 2002-2595 (La.03/28/03), 840 So.2d 566, 2002-2997 (La.06/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).

2

In Louisiana, a legal presumption exists that a defendant is sane at the time of the offense. La. R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La. C. Cr. P. art. 652; *State v. Silman*, 1995-0154 (La.11/27/95), 663 So.2d 27, 32. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, the defendant must show he suffered a mental disease or defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14. The determination of sanity is a factual matter. *State v. Sepulvado,* 26,948 (La.App. 2d Cir.05/10/95), 655 So.2d 623, *writ denied,* 1995-1437 (La.11/13/95), 662 So.2d 465. All evidence, including expert and lay testimony, besides the defendant's conduct and actions, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. Lay testimony concerning the defendant's actions, both before and after the crime, may give the fact finder a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. *State v. Peters,* 1994-0283 (La.10/17/94), 643 So.2d 1222; *State v. Claibon*, 395 So.2d 770 (La.1981).

Expert testimony is relevant to the issue of whether a defendant is insane, but even where experts opine that the defendant is insane the issue is for the jury to decide. *State v. Horne*, 28,327 (La.App. 2d Cir.08/21/96), 679 So.2d 953, *writ denied,* 1996-2345 (La.02/21/97), 688 So.2d 521.

When a defendant who affirmatively offered the defense of insanity claims that the record evidence does not support a finding of guilty beyond a reasonable doubt, the standard for review by the appellate court is whether or not any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could conclude that the defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. *State v. Claibon, supra.*

*State v. Johnson*, 43,935, pp. 3-5 (La.App. 2 Cir. 2/25/09), 3 So.3d 697, 700-01.

At trial, the jury heard the following testimony: Deputy Warner James Levy, an officer with the Calcasieu Parish Sheriff's Office, testified that on the evening of May 4, 2005, he was patrolling on Broad Street in Lake Charles, Louisiana, when he noticed a man, Wilson Locke, in a white car attempting to flag him over. After he made contact, Defendant told him that he had just shot his step-daughter. Deputy Levy stated that Defendant appeared calm. He told the deputy that the gun

3

he used, a shotgun, was in the trunk of the car. Defendant gave him the address, and Deputy Levy sent another officer to the location to verify Defendant's revelation. Deputy Levy said that after the officer called back to tell him he had located the victim at that address and that she was dead, Defendant put his head down and cried.

Sahara Locke, Defendant's son testified regarding the events at the house that evening. He stated that his sister, Serebia, her two-year-old daughter, and Defendant came home late in the afternoon, and the two began arguing about money. He stated that he was in his room at the time but could hear the argument escalate. He said that the argument had degenerated into yelling, when his father went into his own room and came out with something in his hand that Sahara thought was a gun. He heard a "pop" and something drop onto the floor. He said that he sat in a chair and waited to see what was about to happen. He testified that his father came into his room, pointed the shotgun at him, and "fussed" for a few minutes. Defendant then went into the victim's room, covered her with a blanket, and began to try and pull her body out of the room. He told Sahara to help him. Together, they tried to pull her out of the room, but the body was too heavy. Without explanation, Defendant left the house.

Sahara testified that his father was an electrician and that his mother was a nurse. They split up in Sahara's early childhood. However, her daughter, Serebia, stayed with his father. He stated that there were always financial problems. His father was fairly strict, but in the few years before the shooting, he became stricter. It was like "walking on eggshells" around him. Sahara stated that he became like a "clam. I -- I wouldn't speak unless spoken to, and if I was spoken to, I would have to gauge my response as far as -- because you would never know how or what that would lead into." He denied that his father ever saw things that were not there or

4

heard things, but his father did complain that someone had planted a bug in his mouth. Sahara testified that this started about two years before the shooting. He said that his father would leave a tape recording device running to hear if anything was said when he was not in the house. Defendant had also complained that people were gassing the house and worried that someone was in the attic. Testimony established that on the day of the shooting, Defendant bought a shotgun from a pawn shop and shells for the shotgun from Wal-Mart.

Dr. James Anderson was qualified as an expert witness in the field of psychiatry and forensic psychiatry. Dr. Anderson testified that he was initially ordered by the trial court to conduct an evaluation to ascertain whether Defendant was competent to proceed to trial. The first interview with Defendant was in July 2006. At that time, he determined that Defendant was not capable of assisting defense counsel at trial. Later, in November 2010, Dr. Anderson was asked to reevaluate Defendant to determine whether Defendant was "insane" at the time of the shooting and whether the mental defect was such that it prevented him from distinguishing between right and wrong with reference to the conduct in question.

The doctor testified that Defendant suffered from a mental disease at the time of the offense, a delusional disorder, persecutory type, but that Defendant was aware of right and wrong when he shot the victim. He explained that even though Defendant was paranoid, he could still function in society; his "sensorium" was clear. The doctor said that to determine Defendant's mind set, he looked for consistencies. He said that Defendant told him how his step-daughter went with him that day to a pawn shop to buy a shotgun. She bought a television. When they got home, they argued over the TV. She said she wanted the TV for her room, and he did not think she needed a TV in her room. They argued over the money. After he shot her, he tried to call 911, but his phone was dead so he went out to get some

5

help. Dr. Anderson described how the day after the shooting, a social worker spoke with Defendant in jail: "[E]vidently he was emotionally distraught, and he said, 'Well, how would you feel if you just killed someone?'" He testified that he asked Defendant if it was wrong to have killed his step-daughter, and Defendant answered, "yes."

The doctor described how the next day, when he spoke with Defendant again, Defendant was very evasive in his responses. The doctor testified that:

> Then he made the statement, "I couldn't tell the difference between right from wrong at that particular time. Everything was crazy." I just think that's significant. I've never had anybody tell me that before, you know, just to—just to make it clear, "I couldn't tell the difference between right from wrong at that particular time," in case you weren't getting the gist of this. I thought that fell out, and I've done this for over twenty years.

The doctor further speculated that Defendant was malingering at this point. He defined malingering as the "faking or embellishing of either physical or psychological symptoms for identifiable secondary gain." He testified that Defendant told him in July 2006, that he intended to plead not guilty by reason of insanity.

Dr. Garrett Ryder, a psychiatrist, also examined Defendant on May 16, 2012. He agreed that Defendant suffered a delusional disorder. However, he thought that Defendant was more of the delusional depression type. He agreed that certain behavior, like attempting to move the victim's body, covering it with a blanket, attempting to call for help, then going out to seek help from a police officer, and crying when it was confirmed that the victim was deceased, was evidence that Defendant knew it was wrong when he shot the victim.

An attorney, Steven Hale, testified that he did some civil work for Defendant a short time before the shooting. He testified that Defendant also consulted with him regarding a belief that his landlord was spying on him. Mr. Hale testified that

Defendant became a concern, and he advised his office personnel to watch out for him because of his erratic behavior.

Dr. Craig Waggner, a medical psychologist with the Behavioral Health Clinic in Lake Charles, testified that he worked at East Feliciana Forensic Facility when Defendant was committed and evaluated Defendant in 2008 to determine whether he was malingering. He stated that he observed Defendant for several months and determined that, at the time, he was not malingering. He further stated that he diagnosed Defendant as either being a paranoid schizophrenic or having a delusional disorder, persecutory type. He stated that he did not evaluate Defendant to determine whether he knew right from wrong when he shot his step-daughter.

Finally, Dr. Ted Friedburg, a clinical psychologist and neuropsychologist, testified that Defendant was insane at the time he shot the victim and that he did not know right from wrong when he did so. He stated that he met with Defendant five or six times, for a total of eight to ten hours. He reviewed all the records. He noted that in a report made by one of the doctors at the hospital, it was said that Defendant thought the federal government was using his son and step-daughter against him. He said that "[t]here's no doubt that he [Defendant] has a severe mental disorder and that he's not malingering; he's not faking anything." He testified that "in Mr. Locke's particular case, I think that his actions were certainly mitigated by a mental disease and that this act is certainly a product of that -- you know, that activity." Furthermore, "it's a very rambling complex story, and when you try to understand this from some rational standpoint, you don't have to go too far before it doesn't -- doesn't make sense." Ultimately, Dr. Friedburg concluded that Defendant's paranoia was such that he believed he was going to be harmed unless he defended himself.

7

In brief, Defendant argues that the "State failed to rebut the testimony of Dr. Friedberg." However, Defendant had the burden of proving the affirmative defense of insanity by a preponderance of the evidence. The question, then, is whether, after viewing all of the evidence in the light most favorable to the prosecution, the jury could have found that Defendant failed to prove that he was insane by a preponderance of the evidence. *Johnson*, 3 So.3d 697.

In *Johnson*, the defendant, who had been in mental institutions at various times, shot and killed his mother and father. After his sister discovered their bodies, the defendant sat on a chair on the front lawn waiting for the police. He told his sister he had done it, which she told the police. The jury heard several witnesses testify that on the day of the shooting, his "behavior ranged from dancing when no music was playing, to talking to inanimate objects, to walking very quickly back and forth in front of the store." *Id.* at 701. Johnson told the police that his family had harassed him and threatened to lock him back up. Family members testified that when he was taking his medication, he was okay, but when he was off the medication, there was no reasoning with him.

There were five experts who had all examined Johnson at various times. The first to testify for the State, an expert in psychiatry and forensic psychiatry, testified unequivocally that although the defendant suffered from a "psychotic illness of schizophrenia" and was insane, he could distinguish between right and wrong, even though he was not taking his medication. *Id.* An expert in clinical and neuropsychology was called by the defendant. He opined that the defendant was not guilty by reason of insanity, even though he admitted that a person who was delusional could still know the difference between right and wrong. The third expert, also an expert in clinical psychology, actually changed his mind after first determining that the defendant did know the difference. However, he expressed

uncertainty. The fourth expert opined that the defendant was insane and did not know what he was doing, and the final rebuttal expert testified that although the defendant was insane, he did know that he was doing wrong when he killed his parents.

The second circuit affirmed the convictions, stating:

> Whereas the standard of proof for him to prove insanity is less than that required of the state to prove guilt, it is reasonable, viewing the evidence in the light most favorable to the prosecution, to determine that Johnson failed to meet his burden.
>
> The decision about which witness to believe belongs to the jury and should not be overturned by this court unless an abuse of discretion can be shown. Here, the jury could have believed one or two of the doctors over the others and found that the defendant failed to prove his insanity at the time of commission of the offense. Specifically, the testimony of Dr. Seiden was very strong for the state, and it was not well challenged by the defense. The opposing opinions of Dr. Vigen and Dr. Ware appear, even on the cold record, hesitant and unsure. But finally, the rebuttal testimony of Dr. Williams was extremely clear and direct as to his belief that Johnson, even suffering from chronic paranoid schizophrenia, had the ability to distinguish right from wrong. Dr. William's opinion cast great doubt on the reliability of some of the findings and opinions of the defense experts. The jury gave more credence to the opinions of Dr. Seiden and Dr. Williams, and such a determination was clearly within the jury's discretion and reasonable in this case. Furthermore, in addition to the expert testimony the jury also considered the lay testimony of Deputies Price and Alford. They recounted that Johnson intended the consequences of his action-action he took because he did not want his parents to hospitalize him again. Weighing that testimony with the expert opinion testimony of Drs. Seiden and Williams, the jury's verdict appears entirely reasonable. So considering, there is no basis for this court to substitute its opinion for that of the jury's ultimate determination in this matter.

*Id*. at 704.

Apparently, the jury in the current case did not find Dr. Friedberg's testimony convincing. Furthermore, there was little evidence given of Defendant's behavior prior to and during the shooting to indicate that he did not know what he was doing.

9

In the current case, the son reported that Defendant had complained about having a bug put into his mouth and was concerned enough about people being in the house that he used recording devices to attempt to hear what they said while he was out. The son also reported that there was a history of financial stress in the house and that Defendant and his step-daughter argued often about money. After Defendant shot the victim, he left the house with the shotgun but carefully put the shotgun in the trunk of the car.

Considering the evaluations by Drs. Anderson and Ryder, the brief description of Defendant's behavior the day of the shooting, and his increasingly paranoid behavior the few years prior to the shooting, it might be said that Defendant suffered a mental disease that caused him to be delusional and persecutory but that did not prevent him from distinguishing between right and wrong. The jury heard all of the testimony and obviously concluded that Defendant had not proven by a preponderance of the evidence that he was unable to comprehend that shooting his step-daughter was the wrong thing to do.

Alternatively, Defendant argues that should this court find that he did not meet his burden of proof that he could not distinguish between right and wrong when he shot and killed his step-daughter, there was insufficient evidence to find him guilty of second degree murder. Defendant requests that this court vacate the verdict of second degree murder and enter a conviction of manslaughter. He argues that "no rational trier of fact could have found that Wilson Locke, Jr. failed to establish the mitigating factors of manslaughter by a preponderance of the evidence."

Second degree murder is defined, in pertinent part, as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1.    Manslaughter, in pertinent part, is defined as:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

In *State v. Johnson*, 06-623, pp. 8-9 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, 702, *writ denied,* 06-3024 (La. 9/14/07), 963 So.2d 995, this court examined manslaughter, as follows:

> As explained by the Louisiana Supreme Court in *State v. Snyder*, 98-1078 (La.4/14/99), 750 So.2d 832, "sudden passion" and "heat of blood" are not elements of manslaughter. "Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors." *Id*. at p. 4, 837-38. If a defendant establishes, by a preponderance of the evidence, the presence of these mitigating factors, he or she is entitled to a verdict of manslaughter. *Id. See also State v. Lombard,* 486 So.2d 106 (La.1986).

*State v. Brown*, 00-1021, p. 6 (La.App. 3 Cir. 1/31/01), 780 So.2d 536, 540, *writ denied,* 01-912 (La.2/1/02), 807 So.2d 854.

> Regardless of the words exchanged, "mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter." *State v. Massey*, 535 So.2d 1135, 1143 (La.App. 2 Cir.1988). *See also State v. Mitchell*, 39,202 (La.App. 2 Cir. 12/15/04), 889 So.2d 1257, *writ denied*, 05-132 (La.4/29/05), 901 So.2d 1063, quoting *State v. Conerly*, 48 La.Ann. 1561, 21 So. 192 (1897)). "Further, an argument alone will not be a sufficient provocation in order to reduce a murder charge to manslaughter. *State v. Miller*, 98-642 (La.App. 3 Cir. 10/28/98); 720 So.2d 829, citing *State v. Gauthier,* 546 So.2d 652 (La.App. 4 Cir.1989)." *State* v. *Charles*, 00-1611, p. 4 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, 519, *writ denied*, 01-1554 (La.4/19/02), 813 So.2d 420.

> In reviewing the Defendant's claim, this court must determine "if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors were not established by a preponderance of the evidence." *State v. Hamilton*, 99-523, p. 7 (La.App. 3 Cir. 11/3/99), 747 So.2d 164, 168.

11

In the current case, Defendant did not establish by a preponderance of the evidence that he acted under provocation sufficient to deprive him of his self-control and cool reflection. There was testimony only that Defendant and his step-daughter argued over finances and that it was a common theme between the two. While Defendant's son testified that there were always money problems in the household, there was no testimony regarding Defendant's and the victim's comments to each other, whether they ever hit each other, or that the victim stole money from Defendant; therefore, nothing rose to the level of "sudden passion" or "heat of blood."

In fact, there was testimony that while the two were arguing in the victim's room, Defendant walked out of her room, retrieved the shotgun, and went back to her room. This act can be seen as intent to, at the very least, inflict great bodily harm. Aiming a gun directly at a victim and pulling the trigger supports a finding of specific intent to kill or inflict serious harm to the victim. *State v. Lawson*, 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516.

Accordingly we find no error in the jury's determination that the evidence supported a conviction for second degree murder.

*Request to Remove Juror*

Defendant argues that the trial court erred when it denied Defendant's request to remove a juror, Ms. Lastrapes, who appeared to have slept through a portion of the State's case. Defendant had noticed that one of the juror's head was down. He pointed it out to the judge at a time the jury was out of the courtroom. The judge responded that he had not seen the juror but that "[i]t may have been a rather isolated event. And I'm not going to -- I'll keep my eye out, and if I see any evidence of that, I'll certainly take care of it when we finish. Okay."

12

However, shortly thereafter, it was noticed that the juror again appeared to be sleeping. The judge called to her: "Ms. Lastrapes, we need your attention, please, ma'am. Sorry." She answered: "Yes." However, a few minutes later, the judge again called out to the juror: "Ms. Lastrapes, are you with us, ma'am?" She answered: "I'm with you."

Prior to closing arguments, Defendant asked that Ms. Lastrapes be removed from the jury and an alternative juror be substituted.

> THE COURT: Well, and, you know, we were watching her, and she did rest her eyes a couple of times, and that's kind of how I viewed it was resting her eyes and - - but she was - - I think she was paying attention. I don't think it raises to the level of excusing her here at the end of the matter so, I'm going to deny that request.

> MR. WILLIAMS: [Defense counsel] Note our objection for the record.

Louisiana Code of Criminal Procedure Article 789, in pertinent part, provides that "[a]lternate jurors . . . shall replace jurors who become unable to perform or disqualified from performing their duties" prior to the time the jury retires to consider its verdict. However, it is not necessary to remove a juror for dozing off briefly or for merely closing his or her eyes for a while. *State v. Cass*, 356 So.2d 396 (La.1977); *State v. Johnson*, 463 So.2d 620 (La.App. 1 Cir. 1984). *See also State v. Womack*, 592 So.2d 872 (La.App. 2 Cir. 1991), *writ denied*, 600 So.2d 675 (La.1992).

Defendant argues that he was never given the chance to explore Ms. Lastrapes' inability to perform. He claims he suffered prejudice as a result of the trial court's refusal to remove her "as he was convicted by a juror who slept through a substantial part of the proceedings." We note that the first indication that the juror might have dozed off was during the end of Attorney Hale's testimony, which was the beginning of Defendant's case. Thereafter, the juror advised the

judge she was with them towards the end of Dr. Waggner's testimony, Defendant's second witness to testify. However, there was no indication that the juror was asleep during Dr. Friedburg's testimony, who testified that Defendant was insane and discussed the reasons that Defendant could not distinguish between right and wrong when he killed his step-daughter. Furthermore, while Defendant asked the trial court to remove the juror, he did not ask for a hearing to determine whether she was able to perform her function as a juror. Also, Defendant's request was made before closing arguments. Therefore, the juror had the benefit of the recap of the trial from both perspectives.

Finally, we note that the jury verdict was unanimous. It only takes ten out of twelve votes to find a defendant charged with second degree murder guilty. Therefore, had the juror missed something that would have caused her to vote in Defendant's favor, he still would have been convicted of second degree murder. La.Code Crim.P. art. 782. Accordingly, we find no error in the trial court's decision not to dismiss the juror.

## CONCLUSION

For these reasons, the conviction of Defendant for second degree murder is affirmed.

**AFFIRMED.**